NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

EVER GERARDO GASTELUM GARCIA, *Appellant.*

No. 1 CA-CR 15-0435
FILED 6-20-2017

Appeal from the Superior Court in Maricopa County
No. CR2012-128983-001 DT
The Honorable Bruce R. Cohen, Judge

**CONVICTIONS AFFIRMED; SENTENCES AFFIRMED IN PART,
MODIFIED IN PART, VACATED IN PART AND REMANDED
FOR RESENTENCING**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Eric Knobloch
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Jeffrey L. Force
*Counsel for Appellant*

## MEMORANDUM DECISION

Chief Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Samuel A. Thumma and Judge Patricia A. Orozco joined.[1]

**B R O W N**, Chief Judge:

**¶1**        Ever Gerardo Gastelum Garcia appeals his convictions and sentences for first-degree murder, drive-by shooting, and five counts of endangerment. For the reasons that follow, we affirm each of Garcia's convictions, the sentences for murder, drive-by shooting, and two counts of endangerment (modified to reflect one additional day of presentence incarceration credit). We vacate the remaining sentences for endangerment and remand for resentencing.

### BACKGROUND[2]

**¶2**        In June 2012, G.V. attended J.M.'s high school graduation. After the ceremony, G.V. and J.M. had J.M.'s mother's Chevrolet Tahoe and picked up four additional friends to look for a party. J.M. drove, J.C.R. sat as the front-seat passenger, R.M., D.C., and G.V. sat in the "middle seats," and J.J.R. sat alone in the "third row."

**¶3**        The young men drove around throughout the night. At dawn, G.V. noticed a white Chevrolet Impala behind the Tahoe that quickly pulled up on the right side. As the Impala moved alongside the Tahoe, G.V. looked inside the Impala and saw Garcia, whom he recognized, holding a gun. Within thirty seconds, G.V. heard at least five gunshots and saw "the windows burst" and "explode[.]" Instinctively, he ducked down. When the gunfire ended, G.V. heard the Tahoe's engine "roaring" and noticed the vehicle veering out of its lane. He reached over the front seat in an attempt

---

[1]        The Honorable Patricia A. Orozco, Retired Judge of the Court of Appeals, Division One, has been authorized to sit in this matter pursuant to Article VI, Section 3 of the Arizona Constitution.

[2]        We view the facts in the light most favorable to sustaining the verdicts. *State v. Payne*, 233 Ariz. 484, 509, ¶ 93 (2013).

to take the steering wheel, but recoiled when he realized it and J.M. were covered in blood.

¶4            G.V. then saw a brick wall ahead, opened the nearest door, and dove on to the street. Afraid Garcia might circle back and shoot again, G.V. started walking on side streets to the nearby home of a cousin. Along the way, he met up with the other passengers from the Tahoe and they walked together to G.V.'s cousin's home.

¶5            Once there, however, none of them contacted the police. Instead, G.V. called another cousin, who picked them up and drove them back to the site of the shooting. By the time they arrived, police officers had taped off the area, and G.V. learned that J.M. had died. G.V. spoke with the police, telling them he recognized the shooter as Garcia. Later that day, G.V. positively identified Garcia from a photo line-up and Garcia was apprehended.

¶6            The State charged Garcia with one count of first-degree murder (Count 1 – victim J.M.), one count of assisting a criminal street gang (Count 2), one count of drive-by shooting (Count 3), and five counts of endangerment (Count 4 – victim G.V.; Count 5 – victim D.C.; Count 6 – victim J.C.R.; Count 7 – victim R.M.; and Count 8 – victim J.J.R.). The State also alleged aggravating circumstances.

¶7            At trial, Garcia testified that he shot at the Tahoe in self-defense. He explained that some of the occupants of the Tahoe had threatened him on multiple occasions, even shooting at him in one instance. Garcia testified that on the morning of the incident, the Tahoe drove aggressively toward him, causing him to fear that it might hit him from behind. The Tahoe then pulled next to the Impala on the left side and Garcia saw J.J.R. "throwing up gang signs" and then lean down. Fearing J.J.R. may be retrieving a gun, Garcia ducked and "fired a couple shots." In a state of panic, Garcia then threw his firearm out the window and drove away.

¶8            After a thirteen-day trial, the jury acquitted Garcia on the count of assisting a criminal street gang and found him guilty of the remaining charges. The court sentenced Garcia to life with the possibility of release on the murder conviction; a concurrent, aggravated term of twenty-one years' imprisonment for the drive-by shooting conviction; and consecutive, aggravated terms of three years' imprisonment for each endangerment conviction. The court awarded Garcia 1,090 days of

presence incarceration credit for the murder and drive-by shooting convictions. Garcia timely appealed.

## DISCUSSION

### I. Failure to Redact Interview Recording

**¶9** On the fourth day of trial, defense counsel moved to redact a video recording of Garcia's police interview and eliminate any reference to guns found where he lived. Specifically, because none of the guns seized from where Garcia lived had been "forensically tied" either to him or the shooting, and the guns allegedly belonged to two gang-member felons (his brothers), Garcia argued the evidence was irrelevant and would cause "confusion of [the] issues." The State countered that the portion of the interview discussing the guns was relevant to demonstrate that Garcia had initially been evasive with police. The State disagreed that an unredacted video would confuse the issues, explaining the jury would also hear Garcia's statement to police that he threw his gun out the window once he finished shooting. The trial court found that the contested portion of the interrogation video was relevant to show "how the whole interview evolved," and was not unfairly prejudicial. On appeal, Garcia challenges the court's ruling, asserting that because there was no connection between those guns and the shooting, the jury may have found him "guilty by association with his brothers, rather than having acted in self-defense."

**¶10** We review evidentiary rulings for an abuse of discretion. *State v. Armstrong*, 218 Ariz. 451, 458, ¶ 20 (2008). In reviewing a trial court's admissibility ruling, we view the evidence "in the light most favorable to the proponent, maximizing its probative value and minimizing its prejudicial effect." *State v. Ortiz*, 238 Ariz. 329, 333, ¶ 5 (App. 2015).

**¶11** Evidence is relevant if it has "any tendency" to make a fact of consequence in determining the action "more or less probable than it would be without the evidence." Ariz. R. Evid. 401. Relevant evidence is admissible unless it is otherwise precluded by the federal or state constitution, an applicable statute, or rule. Ariz. R. Evid. 402. Relevant evidence may be excluded, however, if its probative value "is substantially outweighed" by a danger of unfair prejudice or confusion of the issues. Ariz. R. Evid. 403.

**¶12** Based on Garcia's admissions that he shot at the Tahoe and then threw the firearm out the window of the Impala, the only issue before the jury was whether he acted in self-defense. Thus, the video recording was not offered to prove that Garcia committed the shooting. Nor was it

offered to demonstrate Garcia's character or propensity to possess firearms. *See* Ariz. R. Evid. 404(b). Instead, the State offered the evidence to show that Garcia had been evasive and misleading during much of the police interrogation, and did not initially claim he had acted in self-defense. Because Garcia's credibility was a critical issue at trial, evidence related to the development of his self-defense narrative was relevant. And given this relevance, Garcia has not shown how the unredacted video recording was so unfairly prejudicial that the trial court abused its discretion in overruling Garcia's objection.

¶13 Moreover, even assuming the trial court erred by admitting the unredacted video recording, the State has met its burden of showing any such error was harmless as to all counts, including Count 8 (*see* ¶¶ 16-18, *infra*). *See State v. Anthony*, 218 Ariz. 439, 446, ¶ 39 (2008) ("The State has the burden of convincing us that any error was harmless."); *State v. Henderson*, 210 Ariz. 561, 567, ¶ 18 (2005) (noting harmless error analysis, applicable where a timely objection was improperly overruled, "places the burden on the state to prove beyond a reasonable doubt that the error did not contribute to or affect the verdict").

¶14 Garcia admitted, both during his police interrogation and at trial, that he shot at the Tahoe multiple times, knowing it was occupied by several people. Although Garcia asserted concerns for his safety based on his previous encounters with some of the victims, he did not claim that any of the victims brandished a weapon or made any threats suggesting his life was in imminent danger. He further admitted that when interviewed by the police, he initially denied any knowledge of or involvement in the shooting, and only later claimed he shot at the Tahoe at least eight times in self-defense.

¶15 In final jury instructions, the court advised jurors they must not consider Garcia's statements to police unless they determined beyond a reasonable doubt his statements were given voluntarily (not resulting from police violence, coercion, threat, or promise), and they were to give such weight as they felt deserving under all the circumstances. Although the jury convicted Garcia on seven of the eight counts, it acquitted him of the charge of assisting a criminal street gang (the only charge dependent upon his association with gang members), indicating the jury carefully considered the evidence presented and was not confused by the portion of the video recording relating to guns seized at the house. In light of the jury's decision to acquit on the charge of assisting a criminal street gang, we may reasonably conclude that the admitted evidence did not improperly influence the jury's verdicts.

¶16         Whether the error is harmless as to Count 8 (one of the five endangerment counts) requires a closer examination of the record. Garcia does not dispute that he endangered the lives of each passenger in the Tahoe. *See* Ariz. Rev. Stat. ("A.R.S.") § 13-1201(A) ("A person commits endangerment by recklessly endangering another person with a substantial risk of imminent death or physical injury."). Instead, he argues the State failed to prove that J.J.R. was a passenger, suggesting there were only four endangerment victims. Section 13-1201, however, "does not require or imply that the name or exact identity of the victim is a necessary element of the offense." *State v. Villegas-Rojas*, 231 Ariz. 445, 448, ¶ 8 (App. 2012). Nonetheless, the number of endangerment convictions obviously cannot exceed the number of passengers that were in the Tahoe at the time of the shooting.

¶17         At trial, a man who was driving a delivery truck when he witnessed the Tahoe's "dramatic stop" testified to seeing three individuals emerge from the vehicle. Adding the victim who was killed and G.V., Garcia contends this evidence demonstrates that only five men occupied the vehicle at the time of the shooting. R.M. testified there were six people in the Tahoe, including four in the back seat, and he identified J.J.R. and J.C.R. as two different individuals. G.V. testified there were six people in the Tahoe: J.M. and J.C.R. in the front; he, R.M., and D.C. in the back "middle seats;" and J.J.R. alone in the back "third row." Garcia, however, argues that G.V. only identified five people in the Tahoe when he initially spoke to police officers, and did not mention J.J.R.

¶18         The trial record reveals some confusion regarding the identity of the passengers. The victim in Count 6, J.C.R., and the victim in Count 8, J.J.R., share similar names. Further, J.J.R. was referred to as both "Juan R." and "Jose R." In response to a juror's question, the parties stipulated that "Jose R. . . . is actually Juan R." J.C.R. and J.J.R. are not the same person. The prosecutor referenced this confusion during closing argument, while explaining where each passenger sat in the vehicle:

> The front passenger, [J.C.R.]. There's also in the middle row, there's [R.M., D.C., G.V.]. And then in the back seat, and this is the infamous how many ways can we say your name Juan R., Juan Carlos – or excuse me, Jose R., Juan Jose R. And that's where the confusion might have been on some of your parts is that his middle name was Jose and sometimes he goes by Jose.

Notwithstanding the confusion, G.V. and R.M. unequivocally testified that there were six people in the Tahoe. Moreover, although G.V. initially identified only five occupants to police, failing to mention J.J.R., the officer who spoke with G.V. testified that he also interviewed J.J.R. and confirmed he was in the Tahoe that night.

**¶19**      On this record, and considering the nature and context of the assumed error, we conclude beyond a reasonable doubt that the admission of the portion of Garcia's interrogation video relating to the guns seized at his home did not contribute to or affect the jury's verdicts on the murder, drive-by shooting, and endangerment charges. *See State v. Bible*, 175 Ariz. 549, 588 (1993) ("Error, be it constitutional or otherwise, is harmless if we can say, beyond a reasonable doubt, that the error did not contribute to or affect the verdict."); *cf. State v. Dann*, 205 Ariz. 557, 570, ¶ 44 (2003) ("Although evidence of prior crimes generally is not admissible, courts will not reverse a conviction based on the erroneous admission of evidence unless there is a reasonable probability that the verdict would have been different had the evidence not been admitted.") (internal citation and quotation omitted).

## II.      Imposition of Aggravated Sentence on Counts 6, 7, and 8

**¶20**      Garcia argues the trial court erred by imposing aggravated sentences on Counts 6, 7, and 8. The State concedes the error, acknowledging that no aggravating circumstances were present for the convictions in Counts 6, 7, and 8, meaning the aggravated sentences for those counts were in error and that a remand for resentencing on these counts is necessary.

**¶21**      Garcia did not object in the trial court, and we therefore review only for fundamental, prejudicial error. *See Henderson*, 210 Ariz. at 567, ¶¶ 19-20. The endangerment counts were charged as, and found by the jury to be, dangerous offenses. Pursuant to A.R.S. § 13-704(A), the presumptive sentence for a class six felony that is designated a "dangerous offense" is two and one-quarter years. Although use of a deadly weapon is a recognized aggravating factor under A.R.S. § 13-701(D), a court may not aggravate a sentence for the use of a deadly weapon "if this circumstance . . . has been utilized to enhance the range of punishment" under A.R.S. § 13-704 (dangerousness). A.R.S. § 13-701(D)(2). Therefore, because the jury found no aggravating circumstances for Counts 6, 7, and 8, the maximum legal sentence for the convictions was the presumptive sentence for a class six dangerous offense: two and one-quarter years. Accordingly, the court erred by imposing an aggravated sentence of three years' imprisonment on

each of those convictions and we remand for resentencing on Counts 6, 7, and 8.

### III. Consideration of Mitigating Factor

¶22        Garcia contends the trial court abused its discretion by failing to consider his age as a mitigating factor when imposing aggravated sentences for Counts 3 through 8.[3]  *See State v. Davolt*, 207 Ariz. 191, 216, ¶ 112 (2004) (sentencing determinations reviewed for an abuse of discretion).  A trial court abuses its discretion "when the sentencing decision is arbitrary or capricious, or when the court fails to conduct an adequate investigation into the facts relevant to sentencing."  *State v. Fillmore*, 187 Ariz. 174, 184 (App. 1996).  "Although [a] court must consider relevant evidence offered in mitigation, it is not required to find that evidence to be mitigating."  *State v. Gonzales*, 181 Ariz. 502, 515 (1995).

¶23        By statute, a defendant's age may be a mitigating circumstance.  A.R.S. § 13-701(E)(1).  At sentencing, the court acknowledged that Garcia's age at the time of the shooting, nineteen years old, was "a factor in this matter."  The court then noted, however, that Garcia had fathered five children, four of whom had been born at the time of the murder, and through that life experience, had "moved . . . beyond [his] age."  Indeed, because Garcia had taken on the adult responsibility of parenthood, the court concluded his age did not merit a mitigated sentence.

¶24        The trial court's finding is consistent with Garcia's own trial testimony.  Acknowledging his previous gang affiliation, Garcia explained that, after having his first child, he distanced himself from the gang-related activities of others, and instead focused "on what [he] needed to do and not what [he] wanted to do."  Garcia also testified that fatherhood had changed his life, requiring him to take responsibility and support his children. Because the record reflects that the court considered the relevant mitigation and aggravation evidence, including Garcia's age, he has not shown the court abused its discretion.

### IV. Calculation of Presentence Incarceration Credit

¶25        Although he received 1,090 days of presentence incarceration credit, Garcia argues on appeal he had a right to 1,091 days of credit for the

---

[3]        Arguably, the remand for resentencing on Counts 6, 7, and 8 moots this issue for those convictions.  Because the issue may arise at resentencing, however, the analysis here is applicable to Counts 3 through 8.

murder and drive-by shooting convictions. The State concedes he is entitled to such credit. A.R.S. § 13-712(B).

**¶26** Garcia was arrested on June 2, 2012 and remained in custody until sentencing on May 29, 2015. Garcia was thus incarcerated for a total of 1,091 days before sentencing and should have received one additional day of presentence incarceration credit, for a total of 1,091 days. We modify his sentence to reflect 1,091 days of presentence incarceration credit on Counts 1 and 3. *See* Ariz. R. Crim. P. 31.17(b); *State v. Stevens*, 173 Ariz. 494, 496 (App. 1992) (modifying sentence to reflect correct presentence incarceration credit).

**CONCLUSION**

**¶27** For the foregoing reasons, we affirm Garcia's convictions, affirm his sentences on Counts 1 and 3 as modified to reflect one additional day of presentence incarceration credit, affirm the sentences on Counts 4 and 5, and vacate his sentences on Counts 6, 7, and 8 and remand for resentencing on those three counts.



AMY M. WOOD • Clerk of the Court
FILED: AA